UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

04 SEP 28  AM 8: 29

U.S. ...
N.D. OF ...

OCTAVIA GRADY-BURKE; DEVONA )
D. CRAIG, )
 )
    **Plaintiffs,** )
 )
    **vs.** )    **CV 02-B-0519-S**
 )
INTEGRATED MEDICAL SYSTEMS )
INTERNATIONAL, INC., )
 )
    **Defendant.** )

**ENTERED**

SEP 2 8 2004 *km*

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary

Judgment. (Doc. 30.) Plaintiffs Octavia Grady-Burke and Devona D. Craig have sued their

former employer, defendant Integrated Medical Systems International [IMS], alleging that

defendant discriminated against them on the basis of their race, African-American, in

violation of federal law. Upon consideration of the record, the submission of the parties, the

arguments of counsel, and the relevant law, the court is of the opinion that defendant's

Motion for Summary Judgment, (doc. 30), is due to be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record

shows "that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the

initial burden of showing no genuine issue of material fact and that it is entitled to judgment



as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving parties to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving parties is to be believed and all justifiable inferences are to be drawn in their favor. *See id.* at 255. Nevertheless, the non-moving parties need not be given the benefit of every inference but only of every reasonable inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS[1]

### A. OCTAVIA GRADY-BURKE

Plaintiff Octavia Grady-Burke began working for defendant as an Administrative Assistant/Receptionist on March 1, 1999. (Doc. 31, Ex. 1 at 42.) In this position, Grady-

---

[1]For purposes of summary judgment, all facts and reasonable inferences therefrom are drawn in favor of the plaintiffs.

2

Burke's job duties included answering telephone calls at defendant's switchboard, handling the mail, signing in visitors, announcing calls, and entering information into the Human Resources database. (*Id.* at 42, 191 and ex. 6.) Teresa Moore, white, was Grady-Burke's supervisor when she was in the Administrative Assistant/Receptionist position. (Doc. 31, Ex. 1 at 126-27.)

On October 2000, defendant reassigned plaintiff to the position of Marketing Assistant; her supervisor in this position was Ellen Henderson. (Doc. 31, Ex. 1 at 107, *id.*, Ex. 2 ¶ 6.)[2]   Her duties included relieving the Receptionist, "all the front desk responsibilities," "ordering lunches and coordinating . . . flights ... for the new sales reps," and "set [ing] up the training rooms at the Birmingham location." (Doc. 31, Ex. 1 at 59-60, 103, 134; *id.*, Ex. 2 ¶10.)  Defendant hired Carolyn Templeton, white, to perform the Receptionist duties. (Doc. 31, Ex. 1 at 59.)  Grady-Burke testified that Templeton did not have the same responsibilities as she did when she worked at the front desk; she testified, "Carolyn . . . had nothing to do but read the paper, take ten to fifteen restroom breaks per day,[3] sleep, get up from her work station, sit over on the couch, prop her feet up and put her head back. She had siesta time." (Doc. 31, Ex. 1 at 61 (footnote added).)  Templeton was

---

[2]Henderson contends that Grady-Burke requested additional duties other than the Receptionist duties. (Doc. 31, Ex. 2 ¶¶ 4-6.)  Grady-Burke denies this conversation ever occurred. (Doc. 34, Ex. 15 ¶ 3.)

[3]At other places in the record, Grady-Burke testified that she walked upstairs for purposes of relieving the receptionist 5-7 times a day, (doc. 31, Ex. 6 at 5), 8-9 times, (Doc. 31, Ex. 6 at 3), and 15-20 times a day, (doc. 31, ex. 1 at 102-03).

paid the same as plaintiff, although plaintiff argues Templeton had "half of [plaintiff's] responsibilities." (*Id* at 78-79.)

Grady-Burke's work area for the first several weeks in the Marketing Assistant position was in a hallway on the floor below the main lobby. (Doc. 31, Ex. 1 at 81; doc. 34, Ex. 15 ¶ 4.) She described her work station as follows:

> My work location was downstairs in an open hallway with a broken desk near two doors where smokers went in and out and the smoke came in and the cold air would come in. And in the summertime,[4] it was still cold, because there was no ventilation. And the desk was broken and I had nowhere to put my purse. My work station had a huge binding machine on top.

(Doc. 31, Ex. 1 at 81 (footnote added).) She contends that area was infested with rats, roaches, ants, and spiders. (*Id.* at 104.) Grady-Burke only worked at this desk for several weeks. (Doc. 34, Ex. 15 ¶ 4.) Plaintiff's predecessor in the position had a different desk in the downstairs marketing area, although her desk was still in the cold because her desk was near the front door. (Doc. 31, Ex. 1 at 105-06.) Her successor worked in the same area as plaintiff had worked. (*Id.*, Ex. 2 ¶ 9.)

Grady-Burke complains that she was denied reassignment to a position in the Collection Department in 2000. (Doc. 31, Ex. 1 at 98-99.) Plaintiff testified, "I worked in the Collections Department for about two months. . . . So I had some knowledge of what was going on and I was capable of being trained as well as those two white females were that came in." (*Id.*) She identifies the "two white females" as Sierra and Wendy. (*Id.* at 98-99.)

---

[4]The undisputed evidence demonstrates that Grady-Burke never worked in this area during the summertime.

Chip Self is a Collections Specialist and supervisor of the Collection Department. (*Id.*, Ex. 4 ¶ 1.) Self admits that he was aware plaintiff had expressed an interest in working in the Collections Department. (*Id.* ¶ 3.) However, he did not reject Grady-Burke in favor of a white female; he testified the only hiring recommendation he made after Grady-Burke expressed an interest in the Collections Department was Nekita Mitchell, a black female. (*Id.* ¶ 3.)[5] Sierra and Wendy, the white females plaintiff refers to in her deposition, are Ciara Griffin and Wendy Long, both hired to work in the Billing Department, not the Collections Department. (Doc. 31, Ex. 4 ¶ 4.)

Grady-Burke testified that Tom Brander, Chief Financial Officer, stated that too many blacks worked for defendant. (Doc. 31, Ex. 1 at 161; doc. 34 ¶ 7.) Plaintiff was told by Sharon Ryce, black, that Brander made this statement. (*Id.*) Ryce left defendant in February 2001; Ryce told Grady-Burke about Brander's statement at the office. (*Id.* at 143, 162-63.) Therefore, Ryce must have told plaintiff about the statement before February 2001.

Grady-Burke testified that Tim Abrasley, white, told her that Ouida Wallace, white, who was Director of Human Resources, had told him, "I have got to keep my eye on these black folks, because you know you have to watch them black folks." (*Id.* at 144, 163, 208.)

Grady-Burke contends that defendant allowed white employees to come to work late and gave them flexibility with their work schedules. (Doc. 31, Ex. 1 at 59, 66.) However,

---

[5]The court notes that Self also hired plaintiff Devona Craig, as well as Kendra Howard, black. (Doc. 31, Ex. 3 at 72; *id.*, Ex. 4 ¶ 3.) Ruth Bunton, white, was hired in Collections, but only after working in a temporary position. (*Id.*, Ex. 4 ¶ 4.)

plaintiff testified that she never asked for a flexible work schedule and did not need flexibility. (Doc. 34, Ex. 15 ¶ 9.)[6]

She also contends that white employees were allowed to wear blue jeans to work and that she was reprimanded when she wore blue jeans. (Doc. 31, Ex. 1 at 52.) She testified that she wore blue jeans to work on November 22, 2000; on that same day, Wallace sent an e-mail to the entire office indicating that blue jeans were not appropriate work attire. (Doc. 31, Ex. 1 at 52-53 and ex. 3.)[7] On the same day that Grady-Burke wore blue jeans, Moore and Abrasely, also wore blue jeans. (*Id.* at 54.) Plaintiff testified that both Abrasely and Moore continued to wear blue jeans after Wallace's e-mail. (*Id.* at 56.) Grady-Burke testified that she did not wear blue jeans to work because white people could wear jeans; she testified that she wore jeans because she "had a doctor's appointment that day and [she] just grabbed something that was going to be easy to put on and take off . . . ." (*Id.* at 172.) Defendant never disciplined any employee for wearing blue jeans to work. (*Id.*, Ex. 2 ¶ 11.)

---

[6]In her Declaration, Grady-Burke states:

> [Ms. Henderson] says I was allowed to have a flexible schedule, but the truth is I never had any discussion with her or anyone at IMS about working a flexible schedule. I never asked to work a flexible schedule and was never given permission to work a flexible schedule.

(Doc. 34, Ex. 15 ¶ 9.)

[7]The e-mail, which was addressed to "All B'ham," stated, "It has been brought to my attention that an employee recently was wearing denims on a day other than casual day. Please be considerate of our fellow workers and not abuse our dress code. Denim pants are not business casual! DENIM pants are to be worn only on casual day." (Doc. 31, Ex. 1, ex. 3.)

6

Grady-Burke also complains that white employees were allowed to sell items at work, but she was told not to sell Mary Kay cosmetics. (Doc. 31, Ex. 1 at 93, 95-96.) She testified:

> Whites were able to sell Indian River fruit. Jenny Bunton, white female, she would sell Indian River fruit at work and she would use the company's computer to send out e-mails selling Indian River fruit and collecting money. Lori Castleberry, white female, would sell Avon. She would go desk to desk with her Avon books, collecting money and distributing e-mails. Blacks weren't allowed to do that.

(Doc. 31, Ex. 1 at 93.) Grady-Burke contends that she was not allowed to sell her Mary Kay products at work. She testified that in 2000 she received a UPS package from Mary Kay, and that Wallace heard her say the words "Mary Kay" and assumed she was selling its products at work. (*Id.* at 94, 95.) According to plaintiff, Wallace told Ryce to tell her that selling Mary Kay products at work was against company policy. (*Id.* at 96.) Grady-Burke told Ryce that she was not selling anything at work, but "that the people that are selling are the two whites downstairs." (*Id.* at 94.) Grady-Burke contends that she never sold Mary Kay products at work. (*Id.* at 97.) She also contends that Bunton and Castleberry continued to sell their products until the time Grady-Burke left in March 2001. (*Id.* at 96-97.)[8]

---

[8]Defendant disputes plaintiff's version of the events. Ellen Henderson, in her Declaration, states:

> I spoke with Ms. Grady-Burke, Jennie Bunton and Lori Castleberry about selling products not related to IMS during work hours. I advised them it was acceptable to sell products on their breaks and lunch hours only. Ms. Castleberry and Ms. Bunton complied with my request. However, I would witness Ms. Grady-Burke speak with Mary Kay customers while incoming IMS business calls were allowed to ring unanswered.

> When I spoke with Ms. Grady-Burke about this situation she explained

Grady-Burke contends, "If it was a specific job duty that a white person didn't want to do, it would be given to a black person." (Doc. 31, Ex. 1 at 69.) She gives two examples: Theresa Moore, who allegedly decided that she did not want to be responsible for ordering office supplies, and Lauren Henderson, whose duties were assigned to Grady-Burke when she moved to Florida in the summer of 2000. (*Id.* at 69-70.) Obviously, no reasonable jury could find that Lauren Henderson's job duties were given to plaintiff because Henderson did not want to perform the job duties; she was no longer in the Birmingham office to perform any duties. (*Id.* at 70-71.) When asked why she thought Moore "didn't want to order supplies" and, therefore, gave the job to plaintiff, plaintiff responded, "It was a common practice for the whites at IMS to go to – the upper management whites at IMS to get things taken from them and given to the black people." (*Id.* at 71-72.) Plaintiff was assigned these additional duties in 2000. (*Id.* at 76-77.)

Grady-Burke also believes that black and white employees were treated differently in terms of pay. (Doc. 31, Ex. 1 at 62.) Specifically, Grady-Burke believes that she was treated less favorably than Templeton because, although she and Templeton earned the same pay, Templeton had only half the responsibilities that Grady-Burke had when she was at the

---

that since her customers were difficult to reach, once she did connect with them by telephone she needed to complete the transaction. Also, Ms. Grady-Burke explained, placing Mary Kay orders took a fair amount of time to accomplish.

(Doc. 31, Ex. 2 ¶ 12-13.) Plaintiff maintains that Henderson never spoke to her and that she did not conduct Mary Kay business at work. For purposes of summary judgment only, the court assumes Grady-Burke's version of the events is true.

front desk.  (Doc. 31, Ex. 1 at 78-79.)  The evidence shows that Grady-Burke was paid $10.58 per hour when she was hired and that Templeton was hired at the same rate in September 2000.  (Doc. 31, Ex. 5 ¶ 3.)  Grady-Burke testified that she was making approximately $11.57 at the time she left in March 2001.  (Doc. 31, Ex. 1 at 43.)

Grady-Burke also complains of racial comments in the workplace.  She testified that she heard Bo Mundy state that if blacks were involved in counting ballots during the 2000 presidential election that "it was going to be a mess."  (Doc. 31, Ex. 1 at 140.)  He also allegedly used the phrase "blue gums" to refer to blacks.  (Doc. 31, Ex. 1 at 140.)  Plaintiff learned of this comment from Ryce, who was told about it by Jennifer Spry.  (*Id.* at 141-42.)  Grady-Burke contends that Vice President of Operations Lee Robinson, white, told Melodie Elam, Human Resources Manager, that he did not want any more black employees, and she was not to hire anymore blacks.  (*Id.* at 10, 151; doc. 34, Ex. 9 ¶ 4.)  Elam testified that this incident occurred in 1999.  (Doc. 34, Ex. 9 ¶ 4.)  Elam had told Ryce about the incident, and Ryce told Grady-Burke.  (Doc. 31, Ex. 1 at 151-52.)

In addition to his comment about hiring black employees, Grady-Burke believes that Lee Robinson further discriminated against her because "[h]e had no blacks in his department," which was the RTB technicians.  (*Id.* at 152.)  Nothing in the record indicates that Grady-Burke ever sought a position as an RTB technician.

Plaintiff also testified that Debra Robinson discriminated against her because, sometime in 2000, "Gayle Eustice [gave] her information on what was going on and the treatment that blacks [were] receiving and she wouldn't do anything."  (*Id.* at 155.)

9

According to Grady-Burke, Debra Robinson discriminated against her because she knew about discrimination and "she did nothing." (*Id*. at 157.) She did not testify that Debra Robinson ever made a racially derogatory remark or made an adverse employment decision that affected her.

Grady-Burke alleges she told President and CEO Gene Robinson, white, that Ellen Henderson, plaintiff's supervisor after she moved to the Marketing Assistant position, had a personal vendetta against her because she was black. (Doc. 31, Ex. 1 at 101; *id*., Ex. 2 ¶¶ 3, 6.) She testified that, sometime in 2000, she told Gene Robinson that Ellen Henderson

> had put me in that open hallway with a broken desk, and the cold air was coming in on me and the secondhand smoke, and that I had to walk up and down the stairs fifteen to twenty times a day to relieve Carolyn for restroom breaks, lunch break, any break that she needed; and that I was given all of – I had taken all the front desk responsibilities with me along with any other duties that any other whites didn't want to do.

(Doc. 31, Ex. 1 at 102-03.) Grady-Burke told Gene Robinson of her belief that she was treated in this manner because she was black. (Doc. 31, Ex. 1 at 103, 137.)

Grady-Burke spoke with Executive Assistant Gayle Eustice, white, on several occasions about the unfair treatment she was receiving. (Doc. 31, Ex. 1 at 101.) According to Grady-Burke, Eustice discussed the problem with "Debra Robinson, Gene Robinson, and Tom Brander, and told them about the unfair treatment that [Grady-Burke] was receiving . . . and if they didn't do something about it, that they were going to be in serious trouble one day." (Doc. 31, Ex. 1 at 101.) In 2000, Eustice told Grady-Burke that Wallace and Ellen Henderson went to Gene Robinson to discussed firing Grady-Burke. (*Id*. at 132-33.) Eustice

also told Grady-Burke that Henderson, Wallace, and Robinson had said that "if they couldn't fire [Grady-Burke], that they would make [her] work[ing] conditions so unbearable, that [she] would leave." (Doc. 31, Ex. 1 at 133; *see also* doc. 34, Ex. 11 ¶ 4.)[9]

Grady-Burke began taking notes during her employment with defendant in September 2000; the last entry she made was on December 19, 2000. (Doc. 31, Ex. 8.) She began looking for other employment in October 2000, because she believed defendant was discriminating against her. (Doc. 31., Ex. 1 at 126.) She accepted a job as an Office Administrator with Papa John's Pizza's, and she gave a two-week notice to defendant on February 27, 2001. (Doc. 31, Ex. 1 at 45-46 and ex. 4.)

Grady-Burke testified that during the last two weeks of her employment, after she had submitted her resignation letter, Billie Dean asked her "why all the black people are leaving." (Doc. 31, Ex. 1 at 184-85.) Dean also asked plaintiff to write a statement that she was leaving defendant because of discrimination, but plaintiff declined. (*Id.* at 187-88.) She was asked by Debbie Kasdorf "where [she] was going." (*Id.* at 185-86.) Dean and Kasdorf are white. (*Id.* at 186.)

Grady-Burke's last day with defendant was March 16, 2001. (Doc. 31, Ex. 1 at 43.) She began her new employment with Papa John's on March 19, 2001. (*Id.* at 43.)

---

[9]In her Declaration, Eustice states: "On several occasions I heard Ellen Henderson . . . and Gene Robinson discuss making working conditions so rough on Octavia that she would quit." (Doc. 34, Ex. 11 ¶ 4.)

11

On September 11, 2001, Grady-Burke filed her change of discrimination with the

EEOC, 179 days after her last day worked for defendant.

Her EEOC charge states:

2. Throughout my employment at IMS, and especially beginning in September, 2000 other black employees and I were subjected to adverse terms and conditions of employment because of our race.

3. From September 2000 IMS management engaged in a pattern of harassment, and adverse discriminatory treatment, including pay discrimination, in an effort to force me and other black employees to quit, because of our race.

4. For example, my job duties were taken away and given to a white employee, I was moved to an undesirable, unheated work area, and I and other black employees were treated differently and less favorably than white employees.

5. On March 16, 2001, I ceased working for the employer due to circumstances described above, resulting in a constructive discharge.

6. I believe I was discriminated against because of my race, black, and in violation of Title VII of the Civil Rights Act of 1964, as amended, in that I was subjected to adverse terms and conditions of employment, a pattern of harassment and discriminatory treatment, a hostile work environment, and was constructively discharged on or about March 16, 2001.

(Doc. 31, Ex. 1, ex. 2.)

## B. DEVONA CRAIG

Defendant hired Devona Craig to work in its Collections Department on March 16,

1998. (Doc. 31, Ex. 3 at 15.) Her supervisor was Chip Self, white. (Doc. 31, Ex. 4.)

Craig believes that it was unfair that she did not receive an evaluation or a pay raise

in 2000 or in 2001. (*Id.*, Ex. 3 at 39-40.) Craig does not know if anyone else in the

Collection Department received an evaluation during that time period. (*Id.* at 40-41.) Craig

concedes that "it [is] possible that [her] not getting an evaluation had nothing to do with [her]

race and simply had to do with management deficiencies." (*Id.* at 41.)[10]

Defendant's Vice-President of Financial Administration, Barry Davis, white, began

working in the same department as Craig in 2000. (*Id.* at 16, 18.) Craig testified that Davis

discriminated against her in the following manner:

> The area that I worked in the collections department, there were two
> white females that worked on the side of me. And when Barry would come
> into the department, he would come in and speak to those two white female
> employees and wouldn't say anything to me. And I sat a couple of feet away
> from them.

(*Id.* at 15.)

Craig also believes that Davis discriminated against her by reprimanding her for

sending a company-wide e-mail; this occurred "the latter part of 2000." (Doc. 3, Ex. 3 at 19-

21.) Craig testified that Davis and Wallace came to the department and told "[e]verybody

that was in the billing and collections department" not to send company-wide e-mails that

were not business related. (*Id.* at 19-20, 22.) Plaintiff does not have any evidence to support

her claim that white employees that sent e-mails company-wide were treated more favorably.

(*Id.* at 164.)

Craig believes that Davis discriminated against her when he took away her

responsibility for making the daily deposit and gave that job responsibility to Jenny Bunton,

---

[10]Defendant has presented evidence that Craig did not receive an evaluation or raise
because of a wage freeze. (*See* doc. 31, Ex. 4 ¶ 9.)

white, in 2000,[11] and he gave Christa Bailey, white, responsibility for setting up new accounts in 2001. (Doc. 31, Ex. 3 at 37-38, 89-90.) Craig believes that the reassignment of this job responsibility caused her to lose the opportunity to earn overtime pay. (*Id.* at 53, 89.) However, Craig concedes that a memo from Davis, dated April 30, 2001, reiterating the defendant's policy regarding overtime and after-hours work was sent to all employees, both white and black, in the Billing and Collections Departments. (*Id.* at 101 and ex. 2.) Craig testified that her overtime hours stopped at or about the time of the April 2001 memo. (*Id.* at 101.)

Craig testified that she felt that Brander did not talk to her because of her race. (*Id.* at 47.) She said, "Tom Brander would pass me in the hallway, wouldn't speak. I would

---

[11]Craig testified:

A. The only reason that I really got was that [Bunton] wanted to do the deposits and they were given to her.

Q. Who told you that?

A. [Bunton] made the statement that she had seven plus years of AR experience, she was overqualified to call hospitals.

. . .

. . . She did not apply for a collection position, so she wanted to enter the deposits.

Q. So what?

A. She was given the deposits to enter.

(Doc. 31, Ex. 3 at 103-04.)

14

speak to him. No response. He would get down the hall and would hold a conversation to a white employee. And I would speak to him and he wouldn't open his mouth." (*Id.* at 46-47.) Craig testified that she does not have any evidence that Brander failed to speak to her because of her race. (*Id.* at 50.)

Craig also believes that Self discriminated against her in 2000 by not training her to handle Visa payments. (Doc. 31, Ex. 3 at 150-51.) Plaintiff testified:

> A. I went to Sharon [Ryce] first and told her that Jenny was doing Visa payments and that I wanted to do Visa payments. And she instructed me to go to [Self] and tell him to train me on doing the Visa payments. And I went to him, I told him that I wanted to do Visa payments. He told me that I would and that he would train me on doing Visa payments.
>
> Q. You think he didn't train you because of your race?
>
> A. Yes. Well, it couldn't be another reason. He couldn't say that I wasn't qualified for it.
>
> Q. Other than there couldn't possibly be another reason, do you have any evidence?
>
> A. No.

(*Id.* at 151.)

However, Craig concedes Self was helpful and supportive, and she did not have a better friend at IMS than Self. (*Id.* at 105-06, 109-10.) Self gave Craig his car to use. (Doc. 31, Ex. 3 at 62.) Plaintiff testified that she was going to buy the car, but she never paid Self any money and she has not made any attempt to get in touch with him since leaving defendant in 2001. (*Id.* at 69-70, 73.) He also paid for a rental car after she wrecked his car.

(*Id.* at 69, 74.)  When she had no car, Self picked up Craig at her home and took her to work;

he also took her son to school.  (*Id.* at 82-83.)

Craig has never heard anyone with defendant make any disrespectful comments about

blacks, but she heard from others that such comments had been made.  (Doc. 31, Ex. 3 at

131.)  She testified:

> Q.  Did you ever hear anybody say anything disrespectful about black people in your presence?
>
> A.  I didn't never [sic] hear anything said, but –
>
> Q.  But it was reported to you?
>
> A.  Exactly.
>
> Q.  Who reported it to you?
>
> A.  It was just word of mouth.  Things was [sic] just going around.  So I can't say who actually reported it.  But you hear conversation, you would hear the conversations that came about of what had been said.  And it was just a group of us:  Kendra Howard, Sandra Cockrell, Tammie Thomas, Sharon Ryce.
>
> Q.  While you were working with Chip Self, Mr. Self never said anything disrespectful, correct, about black people?
>
> A.  No.
>
> Q.  Did anybody in the collection or billing department[s] talk disrespectfully about black people?
>
> A.  No.

(Doc. 31, Ex. 3 at 131-32.)

Craig testified that Howard told her, in 2000, that Lee Robinson had said defendant had met its quota in hiring blacks and was not going to be hiring any more black employees. (*Id*. at 133.)

Jenny Bunton was hired in October 1999 at $11 per hour. (Doc. 34, Ex. 12 at D240-41.) Plaintiff was hired at $8.65 per hour and was earning $10 per hour in 1999. (Doc. 31, Ex. 5 ¶ 4.) Ruth Bunton's starting rate was $10 per hour in January 2000, after she became a full-time employee in the Collections Department. (*Id*.)

Craig began looking for another job in May or June 2001. (Doc. 31, Ex. 3 at 108.) Craig found another job before she left defendant in July 2001. (*Id*., at 7, 148.) Although Craig claims she quit defendant because she found her work situation unbearable, she admits that she possibly told Henderson that she had to leave defendant because she needed more money. (Doc. 31, Ex. 3 at 145, 160-61.) Craig testified that defendant offered to match the rate of pay offered by her new employer, $12.50 per hour, when she turned in her two weeks notice. (Doc. 31, Ex. 3 at 148.) Self and Franklin Johnson, who was her supervisor over the Billing Department at the time, told plaintiff that they did not want her to leave and that they wanted her to stay. (*Id*. at 11, 149.)

Craig tendered her resignation in a letter dated July 10, 2001; her resignation was effective July 24, 2001. (Doc. 31, Ex. 3, ex. 1.) In her resignation letter, Craig wrote:

> The time I have spent at Integrated Medical Systems has been most regarding and helpful in my career, and I hope that my contributions to the company have been constructive.   My relationship with you has always been professional, warm and results oriented.

17

> I have accepted a position that will enhance my career growth and will expose
> me to the challenges and opportunities, which I believe, are in my best interest.

(Doc. 31, Ex. 3, ex. 1.)

Craig's last day of work was July 24, 2001. (Doc. 31, Ex. 3, ex. 4.) She filed a charge

of discrimination with the EEOC on November 20, 2001, 119 days after the last day she

worked for defendant. (*Id.*) Her EEOC charge states:

> 1. I was hired by the above named employer on or about March 16, 1998 as
> a collection representative in the Collections Department.
>
> 2. Beginning in late 2000, I was subjected to adverse terms and conditions of
> employment because of my race. Other black employees were also subjected
> to adverse terms and conditions of employment.
>
> 3. From late 2000 IMS management engaged in a pattern of adverse
> discriminatory treatment, including pay discrimination, in an effort to force me
> and other black employees to quit, because of our race.
>
> 4. For example, job duties were taken away and given to white employees
> without notice or explanation, my hours and pay were reduced by denying me
> the opportunity to work late and on weekends, I was denied my yearly
> evaluation and denied a pay increase, and I and other black employees were
> treated differently and less favorably than white employees.
>
> 5. On July 24, 2001, I ceased working for the employer due to the
> circumstances described above, resulting in a constructive discharge.

(Doc. 31, Ex. 3, ex. 4.)

On February 27, 2002, plaintiffs filed a Complaint alleging that they had been

discriminated against on the basis of their race. (Doc. 1.) Plaintiffs contend that they were

discriminated against with regard to their pay and racial harassment. They also contend that

they were constructively discharged.

18

### III. DISCUSSION

Plaintiffs allege three race discrimination claims:  (1) constructive discharge, (2) racially hostile work environment; and (3) discriminatory pay.  (Pl. Mem. in Opp. to Mot. for Summ. J. at 15.)

### A. PAY DISCRIMINATION

#### 1. Grady-Burke

Defendant contends that it is entitled to summary judgment as to Grady-Burke's pay claim because, "Plaintiff Grady-Burke attempts to compare herself to Carolyn Templeton although they were compensated at the same hourly rate.  Thus, all of the hyper-sensitivity aside, Ms. Grady-Burke has not shown any differing treatment of white and black employees that can support a *prima facie* case of disparate treatment." (Def. Mem. in Supp. of Mot. for Summ. J. at 15.)  Grady-Burke appears to have abandoned any claim that she was paid less than Templeton as she does not respond to defendant's argument in her Brief in Opposition to Defendant's Motion for Summary Judgment.  (*See* Pl. Br. in Opp. to Mot. for Summ. J. at 16-17.)  Therefore, defendant's Motion for Summary Judgment as to Grady-Burke's pay claim related to her pay while she was Administrative Assistant/Receptionist, is due to be granted and such claim is due to be dismissed. *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied* 516 U.S. 817 (1995)).

However, in her Brief in Opposition to Motion for Summary Judgment, Grady-Burke contends that she suffered pay discrimination after she was moved to the position of

19

Marketing Assistant. (Pl. Mem. in Opp. to Mot. for Summ. J. at 16.)[12]  Defendant has not

presented any evidence or argument regarding Grady-Burke's claim that she was paid less

than white Marketing Assistants.

"[B]efore the non-moving party is required to produce evidence in opposition to the

motion, the moving party must first satisfy its obligation of demonstrating that there are no

factual issues warranting trial." *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir.

1991).

> The moving party bears the initial burden to show the district court, by
> reference to materials on file, that there are no genuine issues of material fact
> that should be decided at trial. *Only* when that burden has been met does the
> burden shift to the non-moving party to demonstrate that there is indeed a
> material issue of fact that precludes summary judgment.

*Coats & Clark, Inc.*, 929 F.2d at 608 (emphasis added).  The non-moving party is not

required to come forward with evidence to rebut evidence the moving party could have

presented, but did not. *See Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.

1989)("When a party moves for summary judgment on ground A, his opponent is not

required to respond to ground B – a ground the movant might have presented but did

---

[12]Plaintiffs' counsel has presented an affidavit that defendant did not produce evidence
regarding the pay of white marketing assistants in response to plaintiffs' discovery requests.
(*See* doc. 34, Ex. 14.)  Because the court finds that defendant failed to raise the issue of
plaintiff's pay with regard to the pay of other, white marketing assistants, plaintiffs were not
required to offer evidence of pretext.  The court's docket shows that plaintiffs' Motion to
Compel (doc. 15) was administratively termed as moot.  The court assumes this was done
based on defendant's response (doc. 22) that it had filed supplemental responses to plaintiffs'
discovery requests which rendered plaintiffs' Motion to Compel moot.  If plaintiffs still have
not received information regarding the pay of marketing assistants Tim Abrasely and Lauren
Henderson, they may file a renewed Motion to Compel.

not.")(citing *Bonilla v. Nazario*, 843 F.2d 34, 37 (1st Cir. 1988); *see also John Deere Co. v. American National Bank*, 809 F.2d 1190, 1192 (5th Cir. 1987)).

Because defendant did not move for summary judgment as to this Grady-Burke's pay claim based on disparate pay among Marketing Assistants, defendant's Motion for Summary Judgment, asking the court to dismiss all claims, is due to be denied with respect to Grady-Burke's pay claim relating to her pay as a Marketing Assistant.

### 2. Craig

Craig contends that she was paid less than similarly-situated white employee Jennie Bunton. (Pl. Mem. in Opp. to Mot. for Summ. J. at 16.) Defendant did not address Craig's pay discrimination claim in its Brief in Support of its Motion for Summary Judgment. However, in its Reply Brief, defendant argues that Craig "did not make any comparison of her experience, education and qualifications with that of Ms. Bunton. Simply, Plaintiff asks the Court to accept her word she was entitled to receive the same amount of money as Ms. Bunton." (Def. Reply Br. in Supp. of Mot. for Summ. J. at 7.) Although the court finds some merit in such argument, the argument, raised for the first time in defendant's Reply Brief, is unavailing.

As set forth above, defendant, as the moving party, has the burden to establish that it is entitled to Motion for Summary Judgment as to Craig's pay claim before Craig, as the non-moving party, is required to come forward with any evidence. Because defendant failed to point to any evidence with regard to Craig's pay claim in its initial Brief in Support of its

Motion for Summary Judgment, Craig had no duty to present evidence in support of her pay claim.

Because defendant did not present any evidence or argument in support of its motion to dismiss Craig's pay claim, its Motion for Summary Judgment, asking the court to dismiss all claims, is due to be denied with respect to this pay claim.

## B. HOSTILE WORK ENVIRONMENT

Plaintiffs contend, "During the course of Plaintiffs' employment, [they] were subjected to harassment because of their race, black, and abusive, hostile work environment because of their race which continued until their constructive discharge." (Doc. 1 ¶ 11.)

"A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)(citations and internal quotations omitted). To establish a prima facie case of hostile work environment racial harassment, plaintiffs must show:

> (1) that [they] belong to a protected group; (2) that [they have] been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee[s], such as [their race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Id.*; *see Hulsey v. Pride Restaurants, L.L.C.*, 367 F.3d 1238, 1244 (11th Cir. 2004); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)(en banc).

22

"[A racially] objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)).  The *Faragher* Court stated:

> We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [*Harris*, 510 U.S.] at 23. ... "[S]imple teasing, [*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998)], offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions of employment."

*Id.* at 787-88.  In other words, the "discriminatory intimidation, ridicule, and insult," *Miller*, 277 F.3d at 1275, "must be 'so intimidating, offensive, or hostile that it *poisoned* the work environment,'" *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003)(quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir.1999))(emphasis added).

Defendant contends that plaintiffs cannot establish a *prima facie* case of hostile environment racial harassment because "the things they complain about were infrequent, did not unreasonably interfere with their work performance, were not severe and were not physically threatening or humiliating." (Def. Brief in Supp. of Mot. for Summ. J. at 23.)  The court agrees.

In this case plaintiffs contend that they were "harassed" in a number of ways.  Grady-Burke contends that she was "harassed" by the following conduct:

23

1. Defendant moved her to a deplorable work area for several weeks.

2. She was told that members of management had said that there were too many blacks in the company and that no more blacks should be hired.

3. She heard Bo Mundy say that if blacks were involved in counting the votes during the November 2000 presidential election then there was going to be a "mess." She was told that Mundy referred to blacks as "blue gums," and that he had made racial remarks about black employees during management meetings.

4. She was told Wallace had said that she had to keep her eye on black folks.

5. As one of her job responsibilities, Grady-Burke was required to relieve Carolyn Templeton during her breaks. Each time she relieved Templeton she had to walk up stairs; Grady-Burke contends that she was required to relieve Templeton an excessive number of times during the day. She also alleges Ellen Henderson ignored her complaints about relieving Templeton.

6. Templeton and other white employees were allowed to come in late; Grady-Burke was not. Ellen Henderson ignored Grady-Burke's complaints about Templeton coming in late.

7. Black employees were not allowed to wear jeans to work; white employees were allowed to were jeans to work.

8. Grady-Burke was not allowed to sell Mary Kay products at work; white employees were allowed to sell products at work.

9. Grady-Burke was told that Ellen Henderson, Ouida Wallace, and Gene Robinson discussed making her working conditions so bad that she would quit.

Plaintiff Craig alleges that the following actions constitute harassing conduct:

1. Barry Davis and Tom Brander would not talk to her when they came into her department, although they talked to white employees.

24

2. Davis and Wallace reprimanded her in from of her co-workers for sending a company-wide e-mail; she alleges white employees were not similarly reprimanded.

3. Jennie Bunton and another white employee were assigned some of Craig's job duties.

4. Bunton was paid more than Craig.

5. Self told Craig that it was not in her best interest to complain that she felt Bunton was paid more than her and Bunton was given her job duties because Bunton was white.

6. Davis sent an e-mail to all employees restricting overtime. Craig's keys to the building were taken and she was not allowed to work after hours or on weekends. Bunton's keys were taken away but then given back to her.

7. Craig was told that Lee Robinson had said that defendant was not going to hire any more blacks, and that the company had met its quota of blacks.

As a threshold matter, the court finds that plaintiffs' alleged instances of discrete race discrimination should not be included in the "totality of the circumstances" the court considers to determine whether the plaintiffs' workplace was hostile or abusive. Hostile environments develop after, and are proven by evidence of, the cumulative effect of repeated, offensive acts of *harassment*, i.e. "discriminatory intimidation, ridicule, and insult, *Miller*, 277 F.3d at 1275. In that regard, "[h]ostile environment claims are different in kind from discrete acts," *National R.R. Passengers v. Morgan*, 536 U.S. 101, 115 (2002), because discrete acts of employment discrimination, including "termination, failure to promote, denial of transfer or refusal to hire," *id.* at 114, are "specific employment decisions with immediate consequences," *id*. at 115.

25

In addition, although the court typically must consider all acts that occur during the entire period of the alleged hostile environment, the court need not consider acts about which an employee complains that are not part of the same hostile environment. The Seventh Circuit Court of Appeals has "stated that '[t]he concept of cumulation suggests a critical limiting principle. Acts . . . so discrete in time or circumstances that they do not reinforce each other cannot reasonably be linked together into a single chain . . . .'" *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 727 (7th Cir. 2004)(quoting *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002)); *see also Huckabay v. Moore*, 142 F.3d 233, 239-40 (5th Cir. 1998).

The numerous discrete job decisions alleged by plaintiff, related to their pay, disciplinary actions,[13] and job assignments,[14] do not constitute harassment. Therefore, to the

---

[13]Although plaintiffs complain that they were "disciplined" for wearing jeans, selling products at work, and/or sending out company-wide e-mails, plaintiffs were not "disciplined" in the traditional sense and they suffered no adverse consequences as a result of these incidents. They were merely told not to violate company policy with regard to selling outside products, wearing jeans, and sending out company-wide e-mails. "Conversations between an employee and his superiors about his performance do not constitute harassment simply because they cause the employee distress." *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir.), *cert. denied* 525 U.S. 963 (1998).

[14]"[T]he 'hostile' aspect of remaining in an undesirable job assignment is not akin to a pervasive environment claim; it is a discrete employment decision, however adverse it may be." *DeNovellis v. Shalala*, 124 F.3d 298, 311 (1st Cir. 1997). Indeed, the Eleventh Circuit has held:

> Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities. . . . For [this] reason[ ], applying the adverse action requirement carefully is

26

extent plaintiffs attempt to rely on such discrete job decisions to establish that their work environment was hostile or abusive, the court has not considered these allegations in determining whether the work environment was hostile or abusive because of race.

Therefore, plaintiffs' remaining alleged incidents of harassing conduct include Mundy's "blue gum" remark, Mundy's vote-count remark, Robinson and Wallace's statements that they wanted to make Grady-Burke quit, certain management employees statements that they did not want to hire any more black employees and/or that defendant had too many black employees, and Davis and Brander's refusal to speak to Craig.

The mere fact that Davis and Brander did not talk to Craig does not rise to the level that is necessary to show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002)(being "treated coolly and made to feel unwelcome," as well as differential treatment regarding work rules not sufficient to meet this standard); *see McMillan v. Regeneration Technologies, Inc.*, 243 F. Supp. 2d 1324, 1330 (M.D. Fla. 2002)(relying on *Rojas* to find that being "shunned and alienated by her coworkers" was not

---

especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks. . . . We do not suggest that a change in work assignments can never by itself give rise to a Title VII claim; in unusual instances the change may be so substantial and material that it does indeed alter the "terms, conditions, or privileges" of employment.

*Davis v. Town of Lake Park*, 245 F.3d 1232, 1244-45 (11th Cir. 2001).

sufficient to establish a hostile work environment because such behavior did not "rise to the level that is necessary to show that her workplace was 'permeated with discriminatory intimidation, ridicule, and insult' that was so sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment," and because "the alleged shunning and alienation was not overtly racially charged").

The Eleventh Circuit has held that "repeated incidents of verbal harassment that continue despite the employee's objections . . . are indicative of a hostile work environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002)(quoting *Shanoff v. Illinois Department of Human Services*, 258 F.3d 696, 704 (7th Cir. 2001). "[I]ncidents – directed at others and not the plaintiff – do have some relevance in demonstrating the existence of a hostile work environment. However, . . . the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff. *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997)(internal citations omitted). Of the incidents of race-related remarks, only Mundy's vote-count remark was heard by one of the plaintiffs; all other remarks were told to plaintiffs second-hand.

None of the alleged incidents of harassment were intimidating or ridiculing, nor can the court say that the sum total of these alleged incidents of harassment were sufficient to poison the plaintiffs' work environment. Thus, the court finds that the quantity and quality of the alleged harassing conduct is not sufficient to allow a reasonable jury to find that plaintiffs were subjected to racial harassment so severe or pervasive as to create a hostile or

28

abusive work environment. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir.1995)

Therefore, defendant's Motion for Summary Judgment as to plaintiffs' hostile work environment racial harassment claims is due to be granted.

## C. CONSTRUCTIVE DISCHARGE

"A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003)(quoting *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir.1997)).   "The plaintiff must do *more* than merely show that she was subjected to actionable harassment.  'The standard for proving constructive discharge is higher than the standard for proving a hostile work environment.'" *Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1282 (11th Cir. 2003)(quoting *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001))(emphasis added).  The Supreme Court has held:

> For an atmosphere of [discriminatory] harassment or hostility to be actionable, we reiterate . . . the offending behavior must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign*.

*Pennsylvania State Police v. Suders*, _____ U.S. _____, 124 S. Ct. 2342, 2354 (2004)(emphasis added; internal quotations deleted).

29

Based on the court's finding, *supra*, that plaintiffs cannot demonstrate a racially hostile work environment, the court finds that plaintiffs cannot demonstrate that they were constructively discharged. Therefore, defendant's Motion for Summary Judgment is due to be granted as to plaintiffs' constructive discharge claims.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law as to plaintiffs' racial harassment claims and constructive discharge claims, and Grady-Burke's pay claim related to her pay while in the position of Administrative Assistant/Receptionist. However, the court finds that defendant is not entitled to judgment as a matter of law as to Craig's pay claim and Grady-Burke's pay claim related to her pay while in the position of Marketing Assistant. An Order denying in part and granting in part defendant's Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this _27th_ day of September, 2004.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

30